## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

| | |
|---|---|
| Lisa M. Loubert, | CASE NO. 1:25-cv-13084 |
| Plaintiff, | |
| | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| v. | |
| | 1. Violation of Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* |
| Equifax Information Services, LLC; and Prosper Funding LLC, | |
| Defendants. | |

### PLAINTIFF'S COMPLAINT

COMES NOW Plaintiff **LISA M. LOUBERT,** ("Plaintiff"), an individual, based on information and belief, to allege as follows:

### INTRODUCTION

1.    This case arises under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681s-2(b), 1681e(b), 1681i(a)(2)(A), 1681i(a)(4), and 1681i(a)(5)(A). Plaintiff seeks redress for the unlawful and deceptive practices committed by the Defendants in connection with their inaccurate, misleading, or incomplete reporting of Plaintiff's debt.

2.    Defendant Prosper Funding LLC ("Prosper") is not reporting Plaintiff's account accurately as discharged in bankruptcy and is inaccurately reporting post-discharge.

3.    Defendant Equifax Information Services, LLC ("Equifax") is not reporting Plaintiff's Prosper account accurately as discharged in bankruptcy and is inaccurately reporting post-discharge.

4.     Further, Defendant Equifax is not reporting Plaintiff's bankruptcy correctly in the Public Records section of her report.

5.     The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system and unfair credit reporting methods undermine the public confidence that is essential to the continued functioning of the banking system.

6.     A pervasive and fundamental misunderstanding presently thrives in the United States regarding the long-term impact that filing a consumer bankruptcy has on the consumer's creditworthiness. Specifically, consumers tend to believe that since a bankruptcy can be reported on their credit report for ten (10) years, their creditworthiness will be ruined for the same length of time. This is not true.

7.     The *majority* of consumer debtors file a consumer bankruptcy to *raise* their FICO Score and remedy their poor creditworthiness.

8.     In fact, it is possible for consumer debtors to obtain a 700 FICO Score as soon as twelve (12) months from filing a consumer bankruptcy (Chapter 7 or Chapter 13).

9.     Creditors and lending institutions are aware of the misconception that filing a consumer bankruptcy destroys the consumer's creditworthiness of ten (10) years; however, to perpetrate this bankruptcy myth, creditors intentionally and routinely ignore both industry standards and FCRA requirements for accurately reporting bankruptcies, as well as the debts included in those bankruptcies, to keep consumers' credit scores low and their interest rates high.

10.     Creditors know that deviating from recognized credit reporting standards and FCRA requirements will make it difficult for consumers to raise their credit scores and improve their creditworthiness.

11.     This was not the intent of Congress when it enacted the Fair Credit Reporting Act and the Bankruptcy Abuse Prevention and Consumer Protection Act.

## JURISDICTION & VENUE

12.     Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

13.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, 1367, and 15 U.S.C. § 1681.

14.     This venue is proper pursuant to 28 U.S.C. § 1391(b)(1).

15.     Plaintiff alleges that, for purposes of establishing residency under 28 U.S.C. § 1391(b)(1), each named Defendant conducts sufficient business within the forum state and this Court has personal jurisdiction over the Defendants under 28 U.S.C. §§ 1391(c)(2) and 1391(d).

## GENERAL ALLEGATIONS

16.     Plaintiff alleges that the Prosper account was included in her Chapter 7 bankruptcy filing in that the debt occurred pre-petition and was subsequently discharged.

17.     Despite the fact the Prosper account was discharged, the account is reporting on Plaintiff's Equifax credit report with a charge off payment status, past due amount, balance, a charge off comment, and post-discharge payment and account history (i.e. balances and past due amounts); all of which are patently incorrect and misleading.

18.     Plaintiff alleges that despite the fact Prosper was electronically noticed of the bankruptcy via the Bankruptcy Noticing Center ("BNC") and by Plaintiff via a dispute letter, she received a letter from Prosper in June 2025, three (3) months post-discharge, attempting to collect on the aforementioned discharged debt.

19.     Plaintiff alleges Prosper's inaccurate reporting, as described herein, is in furtherance of its attempt to collect of the discharged debt.

20.     Plaintiff alleges that it is patently incorrect and misleading for a debt which was discharged in bankruptcy to report as a charge off, with a past due amount, balance, charge off comment, or post-discharge payment and account history.

21.     Further, the account is reporting this way as of June 2025, several months after the account was discharged. This is misleading as it appears the account is charged off, past due, and collectible instead of discharged.

22.     Moreover, despite the fact Plaintiff filed bankruptcy and received a discharge, Equifax is not reporting this in the Public Records section of her report.

23.     Plaintiff alleges that each and every Defendant is familiar with FCRA requirements and subscribes thereto.

24.     Plaintiff alleges that each and every Defendant understands that deviation from the FCRA requirements or credit reporting industry standards can, and often does, result in the denial of credit, higher interest rates, and prompts a negative inference that would not be drawn if the data were reported in accordance with the recognized standards.

25.     Plaintiff alleges that all of Defendants' actions alleged herein were committed knowingly, intentionally, and in reckless disregard of the unambiguous meaning of the FCRA, regulatory guidelines on accurate reporting, and credit reporting industry standards to purposefully undermine Plaintiff's ability to repair her Credit Score.

26.     In the alternative, Plaintiff alleges that the Defendants' actions were the result of negligent policies, procedures, and an objectively unreasonable interpretation of the FCRA, all which inevitably led to inaccurate, misleading, or incomplete credit reporting.

## FACTUAL BACKGROUND

27.     Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.      FICO, Inc.**

28.     FICO is a leading analytics software company with its principal headquarters in San Jose, California. FICO has over 130 patents related to their analytics and decision management technology and regularly uses mathematical algorithms to predict consumer behavior, including credit risk.

29.     The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent (90%) of lending decisions. [1]

30.     A FICO Score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

---

[1] While there are other credit scoring models, it is well established that FICO Score is by far the most widely used by lenders, employers, insurance companies, and lessors. *See https://www.myfico.com* (a website created and operated by Fair Isaac Corporation ("FICO"), "the company that invented the FICO credit score").

31.    Base FICO Scores range from 300 to 850, while industry specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

32.    Different lenders use different versions of FICO Scores when evaluating a consumer's creditworthiness.

33.    There are twenty-eight (28) FICO Scores that are commonly used by lenders.

34.    A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies ("CRAs").

35.    The three largest CRAs are Experian Information Solutions, Inc. ("Experian"); Equifax Information Services, LLC ("Equifax"); and TransUnion, LLC ("TransUnion").

36.    FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models, or algorithms, are based on the premise that the information provided by the CRAs is accurate and complies with both the FCRA requirements and credit reporting industry standards.

37.    There are five (5) key factors that a FICO Score considers: (1) payment history; (2) amount of debt; (3) length of credit history; (4) new credit; and (5) credit mix.

38.    Each of the five (5) factors is weighted differently by FICO.

39.    In other words, thirty-five percent (35%) of a consumer's FICO Score relates to payment history, thirty percent (30%) relates to the amount of debt, fifteen percent (15%) relates to the length of credit history, ten percent (10%) relates to new

credit, and the final ten percent (10%) relates to a consumer's credit mix, which is the different types of debts reported.

40. Payment history refers to whether a consumer has paid their bills in the past, on time, late, or missed payments. The more severe, recent, or frequent the late payment information, the greater the impact on a FICO Score. Public record items, such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

41. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.

42. Once a delinquent account has been remedied, the longer the account stays current the more a consumer's FICO Score should increase.

43. FICO Scores are entirely dependent upon information provided by data furnishers ("DFs"), such as banks and other financial institutions, to CRAs.

44. A FICO Score is a summary of your credit report. In simple terms, the FICO Score is calculated by taking the five (5) factors (payment history, amount of debt, length of credit history, new credit, and credit mix) for each account in a credit report and calculating a three digit number for lenders to review. "When you apply for credit, lenders need a fast and consistent way to decide whether or not to loan you money." *See* https://www.myfico.com/credit-education/what-is-a-fico-score. If a lender or employer did look past the FICO Score into a consumer's reports, chances are they either do not understand the tradeline meanings themselves, or, if they do and realize something

appears incorrect, they are incapable of recalculating the complex mathematical algorithms in a FICO Score to take the found error into consideration. Therefore, most lenders and employers do not review individual accounts, just a consumer's FICO Score (or average of FICO Scores) in order to make "quicker decisions." *See id*.

45.     Some lenders also use internal scoring models. In these instances, the lenders attempt to produce their own "FICO Score" based upon their internal credit scorecard models. These models are, similar to FICO, based upon algorithms, business rules, codes, etc. and take information reported in the credit reports and assign weights to them in order to assess risk and make determinations as to consumer's creditworthiness. FICO Scores and the scores based off internal models being collectively referred to as "Credit Score."

## B.     e-OSCAR

46.     e-OSCAR is the web-based system developed by Experian, Equifax, TransUnion, and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.

47.     When a consumer sends a dispute letter to a CRA, the CRA then sends an automated credit dispute verification ("ACDV") via e-OSCAR to the appropriate DF.

48.     The ACDV contains codes next to certain data fields associated with a credit file.

49.     When a data furnisher reports on a consumer's account as part of its regular reporting, it sends a regular monthly transmission to each CRA.

50.     When a data furnisher reports on a consumer's account outside of its regular monthly transmission, it sends an automated universal dataform ("AUD") to each CRA.

51.     For clarification, an AUD or other regular transmission is sent when the data furnisher initiates reporting on a consumer's account (e.g., opening an account, updating the account each month, closing an account, etc.), whereas an ACDV is how a data furnisher receives a dispute request from the CRAs and how it updates reporting back to the CRAs after its investigation of the matter.

## C.     Bankruptcy Credit Reporting Industry Standards & Consumer Information Indicator

52.     When a consumer files bankruptcy, certain credit reporting industry standards exist.

53.     Certain data is regularly expected and calculated by FICO when determining a consumer's creditworthiness.

54.     The Consumer Information Indicator ("CII") is a critical field that indicates a special condition that applies to a specific consumer.

55.     It is the credit reporting industry standard to report a very specific CII upon the filing of a consumer bankruptcy.

56.     The CII Code "E" denotes that a Chapter 7 bankruptcy has been discharged.

57.     The CII field is a critical field for consumers as it directly relates and impacts a consumer's creditworthiness.

58.     The lack of a CII reported makes it appear that a consumer has not addressed outstanding debt obligations through the bankruptcy process.

59.     Furthermore, the lack of a CII reported suggests that creditors are free to collect against a consumer as an individual, or that no stay exists to prevent in personam collection activity.

60.     Failure to report the correct CII indicator will prompt those making credit decisions to draw a more negative inference than if the appropriate CII indicator were reported.

61.     The FCRA permits a bankruptcy to be reported for ten (10) years from the date the bankruptcy was filed.

62.     A consumer's FICO Score is directly related to the date on which a petition is filed and acknowledged.

63.     The bankruptcy's impact on a consumer's FICO Score lessens with the passage of time.

64.     Accordingly, the failure to reference the bankruptcy filing (CII field) and/or the correct petition date results in a lower FICO Score, which in turn causes credit decision makers to draw a more negative inference regarding a consumer's creditworthiness.

**D.     Plaintiff's Debt was Discharged Pursuant to her Bankruptcy**

65.     Plaintiff filed a voluntary petition for Chapter 7 bankruptcy on December 20, 2024, in order to repair her creditworthiness and Credit Score.

66.     The Chapter 7 Trustee's Report of No Distribution was entered on February 10, 2025.

67.     Plaintiff's bankruptcy was discharged on March 25, 2025.

68.     Prosper was listed in Plaintiff's bankruptcy schedules and received electronic notice of the bankruptcy filing and discharge order from the BNC.

69.     All debts, including the Prosper debt, were discharged on March 25, 2025.

70.     Prosper had actual knowledge the debt was discharged.

**E.    Plaintiff's Credit Report Contains an Inaccurate and Adverse Tradeline, which Plaintiff Disputed to no Avail**

71.     On July 7, 2025, Plaintiff ordered an Equifax credit report to ensure proper reporting by Plaintiff's creditors (the "July 7 Credit Report").

72.     Plaintiff noticed an adverse tradeline in her July 7 Credit Report, reporting inaccurate, misleading, or incomplete information that did not comply with the FCRA standards.

73.     Plaintiff then disputed the inaccurate tradeline regarding the Prosper account, as well as the Public Records section, via certified mail to Equifax on or about July 17, 2025 (the "Dispute Letter").

74.     Plaintiff's Dispute Letter specifically put Prosper on notice that Plaintiff filed Chapter 7 bankruptcy, received a discharge, and that the account should be updated to report as discharged.

75.     Plaintiff's Dispute Letter specifically put Equifax on notice that Plaintiff filed Chapter 7 bankruptcy, provided the case number, the moth and year of filing and

discharge, and requested that the Public Records section of her report be corrected, as well as requested that all pre-bankruptcy accounts be updated to discharged.

76.     Plaintiff's Dispute Letter also detailed what was perceived to be problematic about the account, addressing the tradeline specifically.

77.     Plaintiff requested that any derogatory reporting be updated to ensure accuracy and completeness of the account as required by the FCRA.

78.     Plaintiff is informed and believes that Equifax received Plaintiff's Dispute Letter and, in response, sent the dispute to Prosper, as the data furnisher, via an ACDV through e-OSCAR.

79.     Plaintiff is informed and believes that Equifax received Plaintiff's Dispute Letter and, in response, failed to conduct an investigation regarding the Public Records section of her report.

80.     On September 17, 2025, Plaintiff ordered another Equifax credit report to determine if her account was updated.

**a.     Inaccuracy – Public Records Section**

81.     Despite actual knowledge, Equifax continued to report Plaintiff's Public Records section without any notification of the bankruptcy or discharge.

82.     Plaintiff alleges that Equifax did not investigate whether Plaintiff filed for bankruptcy.

83.     Equifax failed to update the Public Records section of Plaintiff's report to reflect the bankruptcy.

84.    Equifax should have updated the Public Records section to reflect the bankruptcy.

85.    By failing to report the bankruptcy in the Public Records section, a creditor would be further misled. In addition, a pre-collection due diligence investigation by a debt collector or creditor viewing Plaintiff's Equifax report would not reveal the bankruptcy.

86.    The lack of investigation and reporting of inaccurate and incomplete information by Equifax is unreasonable.

**b.    Inaccuracy – Prosper**

87.    Despite actual knowledge, Prosper continued to report Plaintiff's account, ending in 4371, to Equifax with a payment status of "Charge Off," a past due amount of "$612," a balance of "$612," a "Charge Off" comment, and without notation of the bankruptcy discharge. Further, the account is listed with post-discharge payment history that includes a "CO" for Charge Off in March 2025 through May 2025 and post-discharge account history that includes: (1) a balance of "$612" for March 2025 through May 2025; (2) a past due amount of "$612" for March 2025 through May 2025; and (3) post-discharge comments of "Charge Off" for March 2025 through May 2025. This account is reporting this way as of June 2025, several months post-discharge. This tradeline is patently inaccurate as the account was discharged in bankruptcy in March 2025.

88.    Plaintiff alleges that Prosper did not investigate whether Plaintiff filed for bankruptcy.

89.     Prosper did not update the tradeline to reflect that Plaintiff obtained a discharge in bankruptcy.

90.     Equifax provided notice to Prosper that Plaintiff was disputing the inaccurate and misleading information; however, Prosper failed to conduct a reasonable investigation of the information as required by the FCRA.

91.     Based upon the notice received during the bankruptcy, as well as Plaintiff's dispute, Prosper should have known that Plaintiff received a discharged in her bankruptcy proceedings.

92.     The most basic investigation would include a simple review of its reporting in light of the fact that Plaintiff filed a Chapter 7 bankruptcy and received her discharge in order to determine if the reporting complies with the maximum possible accuracy and completeness standard of the FCRA.

93.     Plaintiff alleges that Prosper did not review if its reporting complied with the unambiguous language of the FCRA, regulatory guidelines on accurate reporting under the FCRA, or publicly available records concerning Plaintiff's bankruptcy status.

94.     If Prosper reviewed such standards, it would have seen that its reporting was not in compliance and was therefore patently inaccurate or incomplete.

95.     Prosper should have updated the tradeline to CII Code "E" to reflect the debt was discharged in Plaintiff's Chapter 7 bankruptcy and removed the charge off payment status, past due amount, balance, charge off comment, and post-discharge payment and account history.

96.     By continuing to report Plaintiff's account as described herein above, it incorrectly appears to third parties viewing Plaintiff's credit report that the account was not discharged in bankruptcy, which is inaccurate.

97.     As Plaintiff received her discharge the reporting on the account is misleading.

98.     The reporting is misleading as the past due amount, balance, post-discharge payment and account history, along with the lack of any bankruptcy notations further make the account appear as if it is charged off and not discharged.

99.     The term "charge-off" means an account is closed, although the debt is still owed and may be sent to collections. By reporting Plaintiff's account as described herein above, it appears to third parties viewing Plaintiff's credit report that the account was not discharged in bankruptcy, which is patently incorrect and misleading.

100.    As payment history (including payment status) makes up thirty-five percent (35%) of a consumer's FICO Score, and as most lenders approve or deny credit based on a consumer's credit score (as opposed to poring through each tradeline of every account listed to obtain context), the incorrect reporting by Prosper on the account is lowering Plaintiff's Credit Score, which adversely affects Plaintiff's ability to obtain credit.

101.    The incorrect payment status, past due amount, balance, charge off comment, and post-discharge payment and account history reported by Prosper are lowering Plaintiff's Credit Score, which adversely affects Plaintiff's ability to obtain credit.

102.    The lack of investigation and reporting of inaccurate and incomplete information by Prosper is unreasonable.

**F.    Damages**

103.    Plaintiff pulled the credit reports at issue at a cost for access to the reports, after the dispute process, specifically for the sole purpose of verifying that the inaccuracies were fixed.

104.    As a result of the incorrect reporting, Plaintiff has incurred out-of-pocket expenses, and has also suffered emotional harm, physical sickness, and excessive stress resulting in doubt as to the effectiveness of the Bankruptcy Code, the Fair Credit Reporting Act, and the power of this Court to preserve and perpetuate a fresh start as intended by Congress.

105.    Plaintiff has been denied credit and is unable to rebuild her credit based on the inaccurate reporting by Prosper. Further, Plaintiff's diminished creditworthiness, resulting from Prosper's inaccurate reporting, has caused her to abandon her intentions to apply for certain credit.

106.    Prosper's actions, as alleged herein, are in direct violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b).

107.    Plaintiff has been denied credit and is unable to rebuild her credit based on the inaccurate reporting by Equifax on the Prosper account. Further, Plaintiff's diminished creditworthiness, resulting from Equifax's inaccurate reporting, has caused her to abandon her intentions to apply for certain credit.

108.    Equifax's actions, as alleged herein, are in direct violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681.

## FIRST CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681e(b))

### (Against Defendant Equifax)

109.    Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.**    **Equifax Failed to Assure Credit Reporting Accuracy**

110.    Equifax violated 15 U.S.C. § 1681e(b) by failing to establish and/or follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and the credit files it published and maintained concerning Plaintiff.

111.    In a 2007 class action settlement, Equifax agreed to modify its procedures regarding the reporting of all subsequent Chapter 7 bankruptcy discharges. See *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 382 (C.D. Cal. 2007).

112.    As a part of the *Acosta* settlement, Equifax agreed to update reporting on all "Bankruptcy Qualifying Tradelines" accounts. This includes automatically updating the reporting on such accounts to remove the charge-off or collection rating, deleting any current and/or past due balances, and adding Chapter 7 bankruptcy notation on the tradeline. *Id*.

113.    Further, Equifax agreed to establish procedures that it would, of its own volition, update any Bankruptcy Qualifying Tradelines subject to a reinvestigation

request, by removing the derogatory information and adding bankruptcy notation. *Id.*

114.    Equifax failed to report the Prosper account using the procedure it expressly agreed to adopt in *Acosta*.

115.    Had Equifax maintained reasonable procedures to assure maximum accuracy, it would have never reported the Prosper account as described herein.

116.    Equifax knew, or should have known, (1) that the Prosper account was discharged in bankruptcy, (2) that the tradeline should reflect the discharge, and (3) that the account should not have been reported with a charge off payment status, past due amount, balance, a charge off comment, or post-discharge payment and account history as the debt was discharged. Further, Equifax knew, or should have known, that this inaccurate and incomplete tradeline does not reflect *maximum possible accuracy and completeness* as required by the FCRA.

117.    Had Equifax maintained reasonable procedures to assure maximum accuracy, it would have reported Plaintiff's bankruptcy and discharge in the Public Records section of her report.

118.    Equifax knew, or should have known, (1) that Plaintiff filed bankruptcy and received a discharge; and (2) that the bankruptcy should be reflected in the Public Records section of the report. Further, Equifax knew, or should have known, that this inaccurate and incomplete Public Records reporting does not reflect *maximum possible accuracy and completeness* as required by the FCRA.

119.    Congress specifically recognized the "elaborate mechanism developed for investigating and evaluating credit worthiness, credit standing, credit capacity, character,

and general reputation of consumers." *Nayab v. Capital One Bank (USA), NA*, 942 F. 3d 480, 492 (9th Cir. 2019). The investigation and evaluation of Plaintiff's creditworthiness, credit standing, credit capacity, character and general reputation as a consumer are all damaged by the inaccurate reporting Equifax allowed.

120.   As a result of Equifax's violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

121.   Equifax is reporting Plaintiff owes debt that she does not actually owe, thereby damaging her credit score and creditworthiness.

122.   Equifax's reporting is particularly aggravating of Plaintiff's damages because the inaccurate reporting damaged Plaintiff's creditworthiness, which she is attempting to rebuild after bankruptcy.

**B.    Willful Violations**

123.   Equifax's violations, as described herein, were willful; specifically, Equifax has intentionally and purposefully set up a system where inaccuracies are not only probable, but inevitable.

124.   Equifax regularly, as a policy, ignores disputes by consumers and fails to perform even a basic investigation regarding the disputes. Additionally, Equifax regularly fails to forward disputes to data furnishers, thereby frustrating the entire dispute process.

125.   To the extent Equifax does send consumer disputes, it sends these disputes to employees who do not live within the continental United States to hide or subvert a

consumer's liability to confront the individual(s) directly responsible for approving accurate reporting.

126.   Equifax's employees receive little to no training concerning how to accurately report consumer debt.

127.   Instead, Equifax's employees are instructed to parrot whatever information a data furnisher provides regardless of whether the information is accurate.

128.   Equifax's employees are regularly expected to review and approve over ninety (90) disputes per day, rendering less than five (5) minutes to review, investigate, and respond to each dispute received.

129.   Equifax has intentionally set up this system in order to undermine, hide, and otherwise frustrate consumers' ability to properly dispute and correct credit reports.

130.   As a result of Equifax's violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

131.   Equifax's violations were willful, rendering it individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

132.   In the alternative, Equifax was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

133.   Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from Equifax in an amount to be determined by this Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**SECOND CAUSE OF ACTION**

**(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681s-2(b))**

**(Against Defendant Prosper)**

134.    Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    Prosper Failed to Reinvestigate Following Plaintiff's Dispute**

135.    Pursuant to 15 U.S.C. § 1681s-2(b), data furnishers are prohibited from providing any information relating to a consumer to any CRA if it knows, or has reasonable cause to believe, that the information is inaccurate or misleading and requires data furnishers to update and/or correct inaccurate information after a CRA notifies it of a consumer dispute.

136.    After receiving notice of the bankruptcy discharge, Prosper continued to report the account as a charged off account, with a past due amount, balance, a charge off comment, with derogatory post-discharge payment and account history, and without notation of the discharge to Equifax.

137.    Prosper sent an AUD or other monthly transmission to report the account as charged off, with an outstanding balance and past due amount each month from March 2025 through May 2025.

138.    After receiving notice of Plaintiff's dispute from Equifax, Prosper did not correct the inaccurate information, but instead verified and re-reported inaccurately via ACDV to Equifax.

139.   Prosper violated 15 U.S.C. § 1681s-2(b) by either failing to conduct an investigation or failing to conduct a reasonable investigation, and re-reporting misleading and inaccurate account information.

140.   Equifax provided notice to Prosper that Plaintiff was disputing the inaccurate and misleading information; however, Prosper either failed to conduct any investigation or failed to conduct a reasonable investigation as required by the FCRA.

141.   Based on notices received from the bankruptcy court as well as Plaintiff's dispute regarding her bankruptcy discharge, Prosper should have known the debt was discharged in bankruptcy and ceased its inaccurate reporting.

142.   Reporting a discharged debt as charged off, with a past due amount, a balance, charge off comment, and post-discharge payment and account history is patently incorrect.

143.   In addition, this inaccurate reporting also adversely affects credit decisions. This inaccurately reported account is being considered when calculating Plaintiff's Credit Score. Most lenders, employers, and other individuals who access a consumer's credit report approve or deny credit or employment based upon the reported credit score and do not take the time to look through each tradeline of every account listed to obtain context. Therefore, Prosper's reporting as described herein has a direct adverse effect on Plaintiff's Credit Score and her ability to rebuild her Credit Score and obtain new credit.

144.   In the alternative, even if a credit reviewer did look at the tradeline, it would be misled as Prosper's reporting makes the account appear to be charged off and outstanding as recently as June 2025 (three months after discharge), instead of discharged in bankruptcy.

145.    Prosper's reporting is patently incorrect and misleading.

146.    As a result of Prosper's violations of 15 U.S.C. § 1681s-2(b), Plaintiff has suffered actual damages, including but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

**B.    Willful Violations**

147.    Plaintiff alleges that Prosper has reported based upon objectively unreasonable interpretations of the FCRA standards of credit reporting and regulatory guidelines on how to accurately report under the FCRA.

148.    Plaintiff further alleges that Prosper has not properly trained those directly investigating disputes on FCRA requirements or credit reporting industry standards and, as such, have each developed reckless policies and procedures.

149.    Plaintiff alleges that rather than train their employees on accurate credit reporting, FCRA requirements, and industry standards, Prosper's employees tasked with reviewing disputes are expected to confirm the information being reported as "accurate" instead of investigating the reporting.

150.    Regulation V imposes on furnishers, in part, a requirement that reporting be accurate. Accuracy's definition includes correctly reflecting the account's terms and liability and reflecting the consumer's performance on the account. The reporting in this case is clearly not accurate.

151.    "A willful [FCRA] violation is one committed with actual knowledge or recklessness." *Persinger v. Sw. Credit Sys., L.P.*, 20 F.4th 1184, 1197 (7th Cir. 2021). A

violation is reckless if there is "an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Safeco Ins. Co. of Am. V. Burr*, 551 U.S. 47, 68 (2007).

152. Considering Prosper had, or should have had, actual knowledge the account was discharged in bankruptcy, its reporting of the account as charged off, with a past due amount, a balance, charge off comment, as well as continuing to report charge offs, balances, past due amounts, and charge off comments for several months after discharge, rather than a CII of "E" can only be considered willful under the relevant case law and regulations.

153. Given the fact Prosper was directly noticed the debt was discharged in bankruptcy, its patently incorrect and misleading reporting was committed with actual knowledge and recklessness.

154. Further, given this knowledge, Prosper knew that its reporting, as described herein, ran an unjustifiably high risk of harm which was known and obvious.

155. Therefore, Prosper's actions were willful violations of the FCRA, which entitles Plaintiff to recover under 15 U.S.C. § 1681n.

156. In the alternative, Prosper was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

### THIRD CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(1))

### (Against Defendant Equifax)

157. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

A.     **Equifax Failed to Reinvestigate the Disputed Information in violation of 15 U.S.C. § 1681i(a)(1)**

158.    Pursuant to 15 U.S.C. § 1681i(a)(1), Equifax was required to conduct a reasonable investigation and to delete any information that was not accurate after receiving notice of Plaintiff's dispute regarding the Prosper account.

159.    Thus, Equifax failed to conduct a reasonable investigation and correct the misleading and/or inaccurate statements on the account within the statutory time frame.

160.    Equifax is not a passive entity bound to report whatever information a data furnisher provides.

161.    Plaintiff alleges Equifax is readily familiar with FCRA requirements and credit reporting industry standards.

162.    Based on the foregoing, Plaintiff alleges that Equifax can, and does, suppress inaccurate information from being reported when data furnishers provide inaccurate information.

163.    Equifax can and does instruct data furnishers on how to properly report certain accounts from time to time upon request from a data furnisher.

164.    Equifax failed to conduct a reasonable investigation because any basic investigation would have uncovered that it was not reporting the Prosper account correctly.

165.    Had Equifax conducted a proper investigation, it could have updated the Prosper tradeline to reflect the bankruptcy discharge, removed the charge off payment status, past due amount, balance, charge off comment, and post-discharge payment and

account history. However, Equifax continued to report the Prosper account as described herein.

166.    Had Equifax conducted a proper investigation, it could have updated the Public Records section to reflect the bankruptcy and discharge. However, Equifax continued to report the Public Records section without any notation of the bankruptcy or discharge.

167.    Plaintiff alleges that Equifax failed to review her dispute, provided discharge order, or any publicly available records database to determine if Plaintiff filed bankruptcy. Despite receiving the Dispute Letter providing notice of the inaccuracy, Equifax failed to correct the Public Records section or conduct an investigation.

168.    Equifax, therefore, did not conduct even the most basic investigation regarding the requirements set forth in the FCRA or credit reporting industry standards, otherwise the aforementioned would have been uncovered.

169.    In the alternative, if Equifax deemed Plaintiff's Dispute Letter "frivolous or irrelevant" under 15 U.S.C. § 1681i(a)(3), Equifax failed to notify Plaintiff of such determination as required by 15 U.S.C. § 1681i(a)(3)(B). As Plaintiff received no such notice from Equifax, Plaintiff alleges Equifax deemed her Dispute Letter valid, and thus triggered its obligations under 15 U.S.C. § 1681i(a)(1) and (2)(A), for which it did not comply.

## FOURTH CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(4))

### (Against Defendant Equifax)

170.    Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

## A.    Equifax Failed to Review and Consider all Relevant Information

171.    Equifax violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff.

172.    Plaintiff alleges Equifax did not seek to review any of Plaintiff's bankruptcy documents, including any from PACER or any other publicly available database. Had Equifax reviewed these documents, it would have seen the Prosper account was reporting inaccurately and should be reported as discharged in bankruptcy.

173.    In addition, had Equifax reviewed these documents, it would have seen Plaintiff filed a bankruptcy and received a no asset discharge, and therefore the Public Records section of her report should reflect this fact.

174.    Equifax's violations of 15 U.S.C. § 1681i(a)(4) have caused Plaintiff to suffer actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

## B.    Willful Violations

175.    Equifax's violations were willful, rendering it individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

176.    In the alternative, Equifax was negligent in failing to review and consider all relevant information Plaintiff submitted, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

177.    Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## FIFTH CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(5)(A))

### (Against Defendant Equifax)

178.    Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.      Equifax Failed to Delete Disputed and Inaccurate Information**

179.    Equifax violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from Plaintiff's credit file or modify the item of information upon a lawful reinvestigation.

180.    Equifax's violations of 15 U.S.C. § 1681i(a)(5)(A) have resulted in Plaintiff suffering actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.      Willful Violations**

181.    Equifax's violations were willful, rendering it individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

182.    In the alternative, Equifax was negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

183.    Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**PRAYER FOR RELIEF**

184.   WHEREFORE, Plaintiff prays for judgment as follows:

a.   For preliminary and permanent injunctive relief to stop Defendants from engaging in the conduct described above;

b.   Award statutory and actual damages pursuant to 15 U.S.C. § 1681n;

c.   Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n;

d.   Award attorneys' fees and costs of suit incurred herein pursuant to 15 U.S.C. §§ 1681n and 1681o;

e.   For determination by the Court that Defendants' policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, *et seq*.; and

f.   For determination by the Court that Defendants' policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.

**DEMAND FOR JURY TRIAL**

185.   Plaintiff hereby demands trial of this matter by jury.


Respectfully submitted,

**SCHUMACHER LANE PLLC**

Dated: September 30, 2025

*/s/ Joshua B. Lane*
Joshua B. Lane
TX Bar No. 24092665
P.O. Box 558
Spring Branch, TX 78070
Phone: (210) 541-2154
Fax: (210) 783-1383
josh@schumacherlane.com